In the Matter of **REALSITE, INC.,** a New York corporation, and its subsidiaries, Debtors.

No. 63–244–BK.

United States District Court
S. D. Florida.

March 3, 1966.

On Claim of Meadow Brook National Bank March 15, 1966.

## FINDINGS AND CONCLUSIONS, AND ORDER REGARDING CLAIMS OF MURRAY HOMELSKY AND SAM DANIELS

FULTON, District Judge.

Exceptions were filed by the Trustee and the Claimant, Sam Daniels, to the Report of the Special Master, as to recommendations concerning the claims of Murray Homelsky and Sam Daniels.

The Master recommended that the claim of Murray Homelsky should be allowed, in the amount of $9,732.96, with interest at 6% from October 11, 1962, based on a judgment obtained by Claimant Homelsky against the Debtor on that date, in the Circuit Court of Dade County, Florida, for severance pay when Murray Homelsky terminated his employment with the Debtor.

The Savings Account, No. 301828, in the Washington Federal Savings & Loan Association of Miami Beach, pledged by the Debtor as security of Continental Casualty Company for a bond posted to supersede the Homelsky judgment, was recommended by the Special Master to be a fund to secure the payment of the Homelsky judgment.

The Master recommended that after satisfaction of the Homelsky claim from the Savings Account, No. 301828, that the proceeds of the account be used for the reimbursement of Continental Casualty Company's costs and expenses and, then, in the event there was an excess, such excess would be subject to a lien of Sam Daniels.

The Master further recommended that the claim of Sam Daniels be allowed in the amount of $7,050.00 and that it was further secured by an attorney's lien on the books, records and documents obtained by Daniels in the course of his employment as attorney for the Debtor.

The Special Master found that Sam Daniels, an experienced attorney, had been retained by the Debtor to represent it in certain litigation, for an agreed fee of $12,500.00, admitted by the Trustee to

be a reasonable charge, of which sum, $7,000.00, together with a $50.00 costs advance, remains unpaid.

The pledge of the proceeds of the Savings Account, No. 301828, in favor of Claimant Sam Daniels, was pursuant to an agreement with the Debtor made December 2, 1962, in which all of the interest of the Debtor in the Account was transferred to him. In compliance with Florida law, a notice of assignment of accounts receivable was filed in the office of the Secretary of State of the State of Florida.

The Special Master found that the Claimant Murray Homelsky was an officer of the Debtor until February 17, 1961, and a stockholder of the Debtor, Realsite, Inc., at all times material to these proceedings, and up to and including the date of the filing of the Debtor's Petition for Reorganization under Chapter X of the Bankruptcy Act.

On April 28, 1963, Realsite, Inc. entered into a new agreement with Murray Homelsky, encompassing all of the respective rights and liabilities between Murray Homelsky and the Debtor. Under the terms of the agreement, Homelsky was to receive from the Debtor $10,-000.00 cash, immediately, and $5,500.00 on terms, secured. In exchange, Homelsky surrendered a $15,000.00 debenture bond of the Debtor which was almost due, and transferred all of Homelsky's shares of stock in the Debtor, as well as delivery of a satisfaction of the judgment then on appeal.

The settlement proceeded to the point of delivery of the satisfaction of judgment, dismissal of the appeal, and delivery of the bond and stock to the Debtor's attorney, Sam Daniels. The filing of the Petition for Reorganization, on July 5, 1963, prevented full conclusion of the transaction and Homelsky remained as a major stockholder of the Corporation.

Continental Casualty Company intervened in these proceedings on petition and order of the Court permitting the intervention, and praying discharge from its obligation on the supersedeas bond posted in the appeal, or that the collateral savings account be released to it.

No evidence was brought before the Special Master to demonstrate that the Murray Homelsky judgment had been perfected to a lien on the property of the Debtor.

Claimant Homelsky, in addition to filing his claim, also requested the vacation of the temporary restraining order against his action in the State Court, where Continental Casualty Company had posted a supersedeas bond.

The exceptions of the Trustee and Claimant Daniels are directed to the portion of the Special Master's Report which sustained objections to certain testimony and exhibits offered in support of the Daniels claim and, also, to that portion of the Report which recommended the allowance of the Homelsky claim as a secured claim, entitled to first charge against the proceeds of the savings account pledged to the Surety, Continental Casualty Company.

Claimant Daniels also excepted to that portion of the Special Master's Report which denied his alternative claim for security in a parcel of real property known as the "Blanco Property" and, also, the denial by the Special Master's Report of an administrative claim for Daniels' unpaid compensation because of the court ordered destruction of his attorney's retaining lien.

Evidence introduced before the Special Master contained instances of unpaid obligations of the Debtor, Realsite, Inc., at the time of the transaction with its stockholder, Murray Homelsky. Included in the unpaid obligations was a $3,840.00 real estate commission, owing to Don E. Brinigar since May 2, 1962, and an obligation owing Jus' Rite Builders Supply Co. of Fort Lauderdale, for $1,192.26, since June 20, 1962, and, also, the claim of Daniels.

Also included in the testimony before the Special Master was evidence that the President of Realsite, Inc., Harold Diamond, told one creditor, in May, 1962, that the creditor would not be able to ob-

tain payment of his over-due salary because, "there were no funds available" for Realsite, Inc. to satisfy the obligation.

### Conclusions

It becomes readily apparent that the Exceptions of the Trustee and Sam Daniels, and the application of Murray Homelsky for vacation of the restraining order against prosecution of his State Court proceeding, revolve about the respective rights in the savings account pledged to Continental Casualty Company and assigned to Sam Daniels.

The Special Master found that the claim of Homelsky, grounded on a judgment obtained October 19, 1962, provided him a special right in the bank account pledged as collateral security with Continental Casualty Company for the posting of a supersedeas bond.

The problem raised by that conclusion, although not specifically considered by the Special Master, is that the Claimant Murray Homelsky concluded a settlement of all his rights with the Debtor within four months of the filing of the Petition for Reorganization on July 5, 1963. Included in the settlement proceedings was the delivery of a satisfaction of the judgment on which Claimant Homelsky's claim is based, and a dismissal of the appeal taken by Realsite, Inc. from the entry of that judgment.

The evidence does not establish that the Homelsky judgment was a lien on the assets of the Debtor. Florida law requires recording of a judgment to establish a lien upon real property. To perfect a lien upon personal property, execution must be placed in the hands of an appropriate officer. See 13 Florida Jurisprudence, Executions, Section 34, page 470, and Florida Statutes, 1963, Section 55.08, F.S.A.

Thus, Murray Homelsky must rely on any rights still remaining in his judgment to obtain the benefit of the security in the hands of the Surety, Continental Casualty Company, and those rights are necessarily merged into the partially concluded new settlement agreement.

The judgment that Murray Homelsky had obtained against the Debtor was a significant part of the settlement agreement that was partially performed. Included in the partial performance was a dismissal of the appeal from the judgment by the Debtor. A nullification of the settlement agreement now, in order to permit Claimant Murray Homelsky to rely only on his rights on the judgment, would be to the extreme prejudice of the Debtor. Such a hardship gives rise to an estoppel against the claim of Murray Homelsky. The judgment must be considered to have been merged into the rights of Claimant Homelsky in the partially concluded settlement agreement. Additionally, the Homelsky judgment had never become final because it had been superseded and appealed and the appeal had not been determined on the merits.

Exhibit 6 in the Daniels hearing, a letter from the attorney for Homelsky, dated April 29, 1963, is definitive of Mr. Homelsky's position in this proceeding. The first paragraphs of that letter state:

"I am in receipt of your notice of dismissal of the appeal of Realsite, Inc. against Murray Homelsky as per our agreement.

"This will have the effect of releasing the security which is up for this appeal."

The rights of Murray Homelsky are also subject to any impediment that would arise by reason of his relationship as a stockholder of the Debtor. Florida Statutes, 1963, Section 608.55, F.S.A., has application to transfers or transactions by Claimant Homelsky with his Corporation, Realsite, Inc. The Florida Statute is made applicable in this proceeding by Section 70(e) of the Bankruptcy Act which makes transfers fraudulent and void under state law also void as to the Trustee in Bankruptcy. Section 70(e) is applicable to Chapter X reorganization proceedings. See 6A Collier, 14th Ed., Section 8.06.

The Debtor, Realsite, Inc., although a New York corporation, was authorized to

do business in the State of Florida, and carried on a substantial portion of its business activity in the State of Florida. This distinguishes these circumstances from that which existed in Crane Co. v. Richardson Construction Company, et al., (CCA 5), 312 F.2d 269.

Florida Statutes, § 608.55, supra, condemns, "transfers" of corporate property to its shareholders in exchange for a claim, not the full value of the property paid in cash when the corporation has refused to pay any of its notes or other obligations when due. This same Statute has another facet applicable when a corporation is insolvent or insolvency is imminent. Conveyances made to *any creditor* are condemned under the conditions of insolvency. This latter feature of the Florida Statute could also apply to the shareholder Murray Homelsky although it would appear that the first part would be sufficient to avoid any transfer if the elements are established.

The Special Master concluded that insolvency had not been proved by the Trustee although uncontradictable evidence was introduced which showed that the corporation could not pay its obligations. It is proper to observe here that the application of such Statutes as 608.-55 consider "equitable insolvency" rather than conventional bankruptcy or "balance sheet insolvency." In Williams v. American Crafts, Inc., 129 So.2d 165 (Fla.App.), *equitable insolvency is defined as follows:*

"Insolvency under the statute does not mean excess of liabilities over assets. It means inability to pay debts in the ordinary course of business."

■ It is undisputed that the corporation had not paid some of its obligations when the transfer to shareholder Murray Homelsky was arranged on April 28, 1963, some two and one-half months prior to the filing of the Petition for Reorganization.

The elements of a comparable statute applicable through Section 70(e) of the Bankruptcy Act were considered by the Fourth Circuit in Davis v. Woolf, 147 F. 2d 629 (CCA 4, 1945). In the *Davis* case,

Woolf, a director of the corporation, had agreed to indemnify a surety on a completion bond. Seven months prior to the filing of the petition in bankruptcy, the company had delivered certain collateral to the surety, which enabled the surety to release the director from his personal collateralizing indemnity agreement. After bankruptcy, the trustee moved against the surety company and the surety and Woolf took the position the transfer was not subject to attack as it was made outside the four month limitation period of Sections 60 and 67 of the Bankruptcy Act. The Court stated, at page 634:

"He [the trustee] would be authorized to proceed under § 70, sub. e, 11 U.S. C.A. § 110, sub. e, of the Bankruptcy Act which empowers the trustee to recover any property of the debtor affected by a transfer which under any federal or state law applicable thereto is fraudulent as against, or voidable for any other reason, by any creditor of the debtor having a provable claim against the bankrupt estate; and the case would turn, as the District Judge held, on the West Virginia law. See Commonwealth Trust Co. [of Pittsburgh] v. Reconstruction F. Co., 3 Cir. 120 F.2d 254."

The court further stated that:

" * * * the difference between fraudulent conveyance and preference is that 'one is inherently and always vicious; the other is innocent and valid, except when made in violation of the express provisions of a statute. One is malum per se and the other malum prohibitum,—and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period.' Van Iderstine v. Nat. Discount Co., 227 U.S. 575, 33 S.Ct. 343, 57 L.Ed. 652."

In short, it is undisputed that Murray Homelsky was a shareholder on April 23, 1963, when he concluded an agreement with the Debtor to pay him $10,000.00 cash and $5,500.00 secured by collateral for the surrender of a $15,000.00 bond, his shares in the corporation, and satis-

faction of his judgment of $9,732.96. The judgment had not become final in any event and in reliance on the agreement with Mr. Homelsky, the Debtor dismissed the appeal which prevented a determination on the merits.

At the time, and for many months prior to the agreement affected with Murray Homelsky, the corporation had not met its obligations which makes operative one feature of Florida Statutes, § 608.55, F.S.A. with respect to transfers in favor of officers and stockholders.

The result is that any benefit of security that would have inured to Murray Homelsky would revert to the benefit of the Debtor and the Trustee, subject to prior rights. The Special Master concluded that Sam Daniels had established a right to the savings and loan account pledged to collateralize Continental Casualty Company, subject, of course, to the rights of Murray Homelsky and the Surety. The Surety is protected on its bond by a delivery of the satisfaction of the judgment by Murray Homelsky and, also, by a determination by this court of the respective rights of the parties.

The Surety intervened in these proceedings to determine its rights under the savings account collateral and its bond and this proceeding has made that determination and will afford the Surety such protection as is necessary to conclude its liability on the supersedeas bond. 6 Collier, 14th Ed., Section 3.17, page 533, reviews the equitable power of this Court in reorganization proceedings under Chapter X of the Bankruptcy Act. The principle of the discharge of a surety under a supersedeas bond or other obligation by action of bankruptcy concepts is, of course, recognized in Section 67(a) (5) of the Act and this is the result of the holding by the court in this opinion.

In addition, it appears that attorney Daniels did have an understanding with the officers of the Debtor that the "Blanco Property" would be security for the obligation owed to him but that understanding was contingent on use of the savings account passbook pledged to secure the Homelsky judgment. Also, the court order which required Daniels to turn over to the Trustee his books, records and valuable documents against which Daniels had a right to retain those books, records and documents is recognized by the Special Master and necessarily results in an obligation by the Trustee to accept the books, records and documents subject to the lien of Daniels which, under the authority of Brauer v. Hotel Associates, Inc. (1963), 40 N.J. 415, 192 A.2d 831, makes the obligation to the attorney an administrative expense of the Trustee.

The creditor, Homelsky, may have an unliquidated claim for a breach of the new settlement agreement with the debtor corporation but this opinion does not make any determination of the merits of that claim.

The Continental Casualty Co. is entitled to be discharged on its supersedeas bond in the proceedings in the Circuit Court of Dade County, Florida, styled: "Murray Homelsky, Plaintiff, vs. Realsite, Inc., Defendant", No. 62L 2549, together with any expenses it has incurred in the protection of that bond.

The creditor, Sam Daniels, has established a secured claim in the savings account pledged with the Continental Casualty Company, in the amount of $7,050.00. Any surplus after satisfaction of the Daniels and Continental Casualty Company claims shall, of course, inure to the benefit of the Trustee.

It is, therefore,

Ordered and decreed as follows:

1. The Trustee's Exceptions to the Report of the Special Master and the objections of Sam Daniels to the Report of the Special Master be and they are hereby sustained.

2. The costs and expenses of Continental Casualty Company, stipulated to be in the amount of $671.66, incurred in connection with the supersedeas bond posted in the proceedings in the Circuit Court of Dade County, Florida, styled: "Murray Homelsky, Plaintiff, vs. Realsite, Inc., Defendant" shall be satisfied from the Savings Account, No. 301828,

with the Washington Federal Savings & Loan Association of Miami Beach, and Continental Casualty Company is authorized to make such payment.

3. That the recommendation of the Special Master that the claim of Sam Daniels be allowed as a secured claim in the amount of $7,050.00 be and it is hereby approved, and, after payment of the costs and expenses of Continental Casualty Company from Savings Account No. 301828 with Washington Federal Savings & Loan Association of Miami Beach, Florida, the amount allowed to Sam Daniels shall be paid from that fund.

4. That any balance remaining in Savings Account No. 301828 with Washington Federal Savings & Loan Association of Miami Beach, after satisfaction of the aforesaid claims of Continental Casualty Company and Sam Daniels, shall be paid over to the Trustee.

5. The petition to dissolve temporary restraining order of Murray Homelsky be, and it is hereby, denied and the order of the Court of February 25, 1964, which restrained Murray Homelsky from proceeding upon execution of judgment issued by the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida, against Continental Casualty Company, in favor of Murray Homelsky, in the case of "Murray Homelsky, Plaintiff, vs. Realsite, Inc., Defendant", No. 62L 2549, be and it is hereby made permanent.

6. Murray Homelsky be and he is hereby granted leave to file a claim for such sums as he may have owing from transactions with the Debtor, Realsite, Inc.

7. The Court retains jurisdiction for such other relief as may be necessary to effectuate the terms of this Order.

## ORDER AND JUDGMENT ON THE CLAIM OF MEADOW BROOK NATIONAL BANK AND TRUSTEES' OBJECTIONS THERETO

Upon the claim of Meadow Brook National Bank, the Trustees' objections thereto, and the Special Master's report and supplemental report:

## PLEADINGS AND PROCEDURES:

Realsite, Inc., a New York corporation, having its principal place of business in Dade County, Florida, initiated the above entitled reorganization proceeding when it filed a voluntary petition for reorganization on July 5, 1963, in the District Court of the United States for the Southern District of Florida.

This Court, on July 10, 1963, entered a wide scope restraining order covering Realsite, Inc. and its several subsidiary corporations. Following entry of the restraining order, several secured creditors of named subsidiaries, separately, questioned the jurisdiction of the Court to enjoin filing or continuation of suits against specified subsidiary corporations of Realsite, Inc.

On July 25, 1963, an amendment to the initial petition for reorganization was filed by Realsite, Inc. and each of its subsidiary corporations, therein named and joined, to specifically include the several subsidiary corporations, Dynamic Enterprises, Inc. inclusive, within the reorganization proceeding. The recitals of the amendment and the certificates, attached to and made a part of the amendment, of resolution adopted by the directors of each subsidiary corporation authorizing voluntary petition for reorganization under Chapter X of the Bankruptcy Act, communicated that each subsidiary corporation sought reorganization in this proceeding.

On August 5, 1963, this Court decreed that the petition for reorganization and the amendment thereto had conferred jurisdiction upon the Court over Realsite, Inc. and its specified subsidiary corporations; and, inter alia, denied the several petitions which had questioned the jurisdiction of this Court over the subsidiary corporations.

The petition for reorganization as amended with the joinder of the subsidiary corporations was approved by this Court on August 22, 1963 and Robert L. Callaway was appointed trustee.

The appointed trustee filed his bond to faithfully account for the estates of

the debtors, and sequent, filed a list of creditors wherein each creditor was assigned and segregated to a designated named debtor.

The appointed trustee, Robert L. Callaway, and the later appointed co-trustee, Alexander J. Munies, or one of them, intermittently filed periodic statement of financial condition and included in each such statement a balance sheet for each debtor.

This Court, by order entered pursuant to Section 196 of the Bankruptcy Act, prescribed the manner in which and fixed a time within which the proofs of claim of creditors and of the interests of stockholders be filed. Claims were filed and objections to several claims were entered. Meadow Brook National Bank filed a proof of claim against Realsite, Inc. and its wholly-owned subsidiary corporation, Dynamic Enterprises, Inc. The trustees filed objections to the Meadow Brook National Bank claim and to the claims of several other creditors.

The entire matter for the hearing of the objections on the several claims was referred to Honorable Julius I. Friedman, a practicing attorney in Dade County, Florida and an attorney authorized to practice law in this Court, as Special Master in lieu of reference to the then acting Referee because of special circumstances as enumerated in the order of reference. The Special Master proceeded with hearings; and with reference to the claim of Meadow Brook National Bank and the trustees' objections thereto, extensive testimony was taken by counsel for Meadow Brook and by counsel for the trustees. Thorough briefs were filed and the Master on the 9th day of April, 1965 filed a comprehensive report with his findings of fact, analysis of the principles of law involved and recommendations.

Insofar as the Meadow Brook National Bank claim was concerned, the Special Master recommended, upon analysis of the factual situation and the law applicable, that the trustees' position be sustained and in substance recommended that the Court set aside certain transfers of numerous notes, mortgages and contracts for sale of property belonging to Dynamic Enterprises, Inc. which it had acquired in business operations in land transactions in the State of Arizona. The Master also recommended that the alleged assumption by Dynamic Enterprises, Inc. of a prior unsecured debt of the parent, Realsite, Inc., to Meadow Brook National Bank be declared void and ineffective. The Master further recommended that additional orders be entered by the Court requiring Meadow Brook National Bank to reassign all of the collateral pledged by Dynamic Enterprises, Inc., and that Meadow Brook National Bank account to and pay back to the trustees, on behalf of Dynamic Enterprises, Inc., moneys which had been paid from the proceeds of the collateral assigned and received by Meadow Brook National Bank from November, 1962 up to the date of the filing of the petition for reorganization on July 5, 1963.

Meadow Brook National Bank filed objections to the Special Master's report, and also submitted supporting briefs. Among the objections, Meadow Brook questioned the jurisdiction of this Court over the subsidiary, Dynamic Enterprises, Inc., because the original petition filed July 5, 1963 was based upon the petition of the parent, and while allegations were made with reference to the coverage of the various subsidiaries named, without any specific corporate action by the directors or officers of the various subsidiaries authorizing the joinder of those subsidiaries into the Chapter X proceedings.

This assertion had not been made by Meadow Brook up to the time of the appointment of the Special Master and a reference of the Meadow Brook claim and the objections of the trustees to that Special Master for determination. The Court was not satisfied that the point had been squarely presented to or fully considered by the Special Master and re-referred the matter to the Master for consideration of that additional postulate. An additional point was raised by Meadow Brook that the separate corpo-

rate entities in the form of subsidiaries should be pierced and all of the corporations treated as one unit. This issue was also referred back to the Master.

Hearings were held before the Master covering these phases, and on December 6, 1965 the Special Master filed a supplemental Special Master's report and notice of the filing of the supplemental Special Master's report on rereference was served by the Clerk of this Court upon the numerous attorneys for the creditors, as well as upon the United States Attorney, and other parties not officially represented by counsel.

The supplemental Master's report was confined solely to the Meadow Brook claim and the objections and claim of illegal transfers to Meadow Brook in November or December, 1962, and the claim of the Trustees for recovery of securities assigned and moneys paid. Meadow Brook filed objections to the Master's report as amended and the matter was set for argument on January 7, 1966 before this Court.

After hearing argument of counsel for the various claimants, including the trustees and Meadow Brook, the Court requested that interested counsel prepare and submit to the Court suggestions for orders on the issue, with a brief analysis of the pleadings and factual matters and determination of law, including in said suggestions the requested relief sought from the Court.

FINDINGS AND ISSUES:

From an analysis of the Master's first report filed in April, 1965, the supplemental report filed on December 6, 1965, and the record, the mass of both oral and documentary testimony which was meticulously analyzed by the Master, are briefly summarized.

In the latter part of September, 1961 the parent, Realsite, Inc., borrowed the sum of $300,000.00 on open account from Meadow Brook National Bank. There was no security given by Realsite to secure the debt, with the exception of some personal endorsements by the officers and directors of Realsite. The net amount of the $300,000.00 loan, after certain deductions, amounting to a gross of about $295,000.00 in round figures was deposited in the latter part of September, 1961 in a general account of Realsite, Inc. which was opened at the Meadow Brook National Bank of New York. Dynamic Enterprises, Inc. at that time was not a part of the subsidiary structure of Realsite, Inc. In his supplemental report the Special Master delineated in detail the treatment of that fund arising out of the original Meadow Brook loan and summarized in particular, in findings No. 54-59 of the supplemental report, that no part of those funds derived from the open loan to Realsite, Inc. could be traced into the subsequent venture in November, 1961 when Realsite, Inc. purchased the outstanding stock of Dynamic Enterprises, Inc. The effective date of the transaction whereby Realsite, Inc. acquired the stock of Sam Sacks and his associates in Dynamic Enterprises, Inc., a Florida corporation, began sometime in the early part of November, 1961 and was consummated, as pointed out by the Special Master, in a formal contract dated the 13th day of November, 1961, which was Trustees' Exhibit No. "A", introduced at the hearing on July 15, 1964 and is one of the exhibits in the record under the Master's first report. It appears from this exhibit and from the Master's findings of fact that Sam Sacks and his associates, pursuant to that agreement in November, 1961, sold all of the outstanding and authorized stock of Dynamic Enterprises, Inc. to Realsite, Inc. for $20,000.00, and for the additional consideration of their agreement to purchase new stock in Realsite, Inc. in the approximate amount of $160,000.00. In this contract certain collateral features were included which provided for an agency sales agreement given to one of the companies owned and controlled by Sam Sacks and his associates for the completion of the purchase and subsequent sale and development of some 8,700 acres of land in the northern part of Mohave County, Arizona. The proceeds

of the new stock sale were to be advanced as needed by Realsite, Inc. as a loan to Dynamic Enterprises, Inc., and there were certain covenants covering the method of sale and development of those properties. The sum of $100,000.00 was paid immediately by Sam Sacks and associates into the general accounts of Realsite, Inc. and the balance of some $60,000.00 was paid within a short time. Moneys were advanced out of the Realsite account by way of loan to Dynamic Enterprises; and in turn this money was used by Dynamic Enterprises, Inc. as a downpayment on the purchase of the lands in Arizona from the Arizona Land Title and Trust Company in Tucson, Arizona, as trustee under certain land trusts.

As moneys were advanced from time to time by Realsite, Inc. these advances were carried on the books of Realsite, Inc. as a loan to Dynamic Enterprises, Inc. and there were numerous inter-corporate transfers from time to time. It appears from a general analysis of the Master's reports and from the undisputed testimony as to the books and records, that while the actual loan advances by Realsite, Inc. to Dynamic Enterprises, Inc. were always substantially in excess of the counter or inter-corporate credits which Dynamic Enterprises, Inc. received by payments from time to time, yet these transactions were kept solely upon an open account basis. There was never any claim made that the contracts for sale or mortgages received by Dynamic Enterprises, Inc. from the sales of the Arizona properties, both wholesale and retail, were ever agreed to be pledged to the parent, and there is no claim that any such pledge agreement was either made or any instrument executed for such purpose. According to the Master's findings, Dynamic Enterprises, Inc. from approximately the middle of November, 1961 until the late fall of 1962 had no transactions with Meadow Brook National Bank, nor was there any privity of contract directly between Dynamic Enterprises, Inc. and Meadow Brook National Bank. In the supplemental report, the Master specifically found that Dynamic Enterprises, Inc. had a separate set of books, maintained separate bank accounts and had a business purpose separate and distinct from that of the parent, Realsite, Inc., and the other subsidiaries, which were then doing business solely in Broward and Dade County, Florida. The Special Master in his supplemental report, as well as in the original report of April 9, 1965, made specific findings of fact with reference to supporting data and testimony in minute detail.

In the late fall of 1962, at a time when the parent, Realsite, Inc., was unable to pay the Meadow Brook note in full, transactions were then entered into whereby a renewal note of $250,000.00 was made by Dynamic Enterprises, Inc., as well as Realsite, Inc., and virtually all of the assets in the nature of mortgages and vendors' interests of Dynamic Enterprises, Inc. in land sales in Arizona were assigned under a comprehensive assignment and financing agreement to secure the $250,000.00 renewal note. This was done, according to the Master's findings, at a time when Dynamic Enterprises, Inc. was not indebted to Meadow Brook National Bank and at a time when it had large accounts payable growing out of the land purchase agreements, and other items of indebtedness which had been incurred in the sale and development of the Arizona properties. A total of approximately $700,000.00 of receivables then owned by Dynamic Enterprises, Inc., and emanated from wholesale contracts in large acreage tracts, as well as some 250 to 300 individual tract sales, were all assigned to Meadow Brook, with the exception of only insignificant items. This procedure was carried out by virtue of a joint resolution adopted by the Board of Directors of Realsite, Inc. and also the Board of Directors of Dynamic Enterprises, Inc., which declared and recited that the proceeds of the $300,000.00 loan to Realsite, Inc. had been used by Dynamic Enterprises, Inc. for its working capital and other corporate purposes. The Special Master found, upon pains-

taking analysis of the financial transactions between the parent and its several subsidiaries and the relevant bank accounts, that there was no basis for such declarations and recitals, that the proceeds from the said loan had not and could not possibly, have been utilized by Dynamic Enterprises, Inc. for working capital and other corporate purposes. The Master specifically found that the venture whereby Realsite advanced funds to or for Dynamic for the Arizona land deal was brought about by the performance of the coordinated agreement whereby Sam Sacks and associates paid approximately $160,000.00 to Realsite for the purpose of having Realsite lend or advance whatever money was necessary for Dynamic Enterprises, Inc.

The Master found as a matter of fact and law that, under the specific provisions of Section 67 of the Bankruptcy Act and the various provisions of that section, which will be enumerated later, Dynamic Enterprises, Inc., even though it was a wholly-owned subsidiary of Realsite, Inc., could not make a voluntary accommodation assumption of the parent's unsecured debt which at that time was over one year old; and without consideration then presently received, assume the balance of that debt in the amount of $250,000.00 and effectually strip itself of its real assets, leaving a hollow shell for its own separate creditors who were not creditors of Realsite, Inc.

The Master found that in the latter part of November, 1962 or early December, 1962, when this transaction was consummated, the assignment was made without consideration to Dynamic Enterprises, Inc. and recommended that this Court enter a judgment or decree under the provisions of the National Bankruptcy Act voiding the transaction and directing the Meadow Brook National Bank to account to the trustees and to repay to the trustees the sum of approximately $45,000.00 which had been paid to Meadow Brook National Bank during the period from December, 1962 to July 5, 1963, the effective date of the reorganization proceedings.

When the Special Master's supplemental report was filed counsel for Meadow Brook filed certain objections, which for the sake of clarity in this opinion are copied in full, being exceptions Nos. 1, 2 and 3:

"1. Finding of Fact 56, in that it is impossible for the special master to trace fungible items, i.e., cash. There was no evidence that Realsite or any of its subsidiaries kept any records of the serial number of each dollar bill deposited in any of its bank accounts. Therefore, it is impossible to understand how the money loaned to Realsite, Inc., by Meadow Brook National Bank could be traced.

2. The Conclusions of Law of the special master in their entirety. (With respect to this objection, Meadow Brook National Bank will file a supporting brief setting forth in detail the reasons for its position).

3. The failure of the special master to include relevant and material evidence contained in the record (which evidence will be set forth in support of Meadow Brook's position in its brief to be filed with these objections)."

Counsel for Meadow Brook National Bank also filed a memorandum in support of its objections to the supplemental report, which this Court will consider as being a clear analysis of its three exceptions. Meadow Brook contended, in the memorandum, that in order for the Master to have arrived at the conclusions and to have made the recommendations which he made he had to find two factual matters in order to apply the provisions of Section 67 of the National Bankruptcy Act, and in particular, Section 67(d). In the brief they contended as follows:

"In order to invoke this section the Special Master had to make two factual determinations: (1) that Realsite, Inc., and its subsidiaries, particularly

Dynamic Enterprises, were separate corporate entities; and (2) that the funds borrowed from the Meadow Brook National Bank, for which loan the security in issue was given, did not inure to the benefit of Dynamic Enterprises, Inc. Both of these factual determinations were necessary before the Special Master could and did rule against Meadow."

Further in said brief, on page 2, counsel for Meadow Brook asserted:

"The Special Master's conclusion, in both the original and supplemental proceeding was premised upon his factual determination that the entities should not be disregarded, at least in the Fifth Circuit, unless to give effect to the separateness of the entities will produce injustice, fraud, or the rights of innocent parties will be prejudiced (Supp. Special Master's Report, CL–1.) And, since he found that none of these conditions existed he held that Dynamic and Realsite were to be treated as separate entities. However, Meadow Brook contends that as a matter of law at this stage of the proceedings, the Special Master was precluded and his finding must stand, the Court lacks jurisdiction over Dynamic Enterprises, Inc., and the Special Master could not adjudicate the validity of the secured transaction involving Meadow Brook. Hence Meadow Brook does not controvert the Special Master's finding of fact (for the purpose of this memorandum only) with respect to the separateness of the corporate entities but posits that this factual question was finally determined when the subsidiaries were permitted to enter the reorganization proceedings in the parent's petition, and since their entry was not questioned or the order permitting them to become part of the proceedings in this manner appealed, that determination became final."

While, in effect, Meadow Brook in the final arguments, both orally and in the brief and exceptions, said that it was not abandoning any of the other objections made, the issue is narrowed to the two points following:

(1) Was there a separate business purpose of Dynamic Enterprises, Inc. and was it a distinct and separate corporation, separate and apart from its parent, Realsite, Inc., so as to come within the admitted rule of the United States Court of Appeals for the Fifth Circuit as laid down in the case of Maule Industries, Inc. v. Gerstel, Trustee, 232 F.2d 294; South Falls Corporation v. Rochelle, 329 F.2d 611; Gill v. Phillips, 337 F.2d 258; and Markow v. Alcock, et al., U.S.C.A. 5, 356 F.2d 194, February 7, 1966?

(2) Did the proceedings under the petition for reorganization as filed on July 5, 1963, and as thereafter amended and approved, confer jurisdiction upon this Court over claims against Dynamic Enterprises, Inc., particularly where Meadow Brook National Bank filed its proof of claim as a secured claim against Dynamic Enterprises, Inc. and tried the issues before the Special Master without objection?

FINDINGS OF FACT:

Section 117 of the National Bankruptcy Act, applicable to Chapter X reorganization proceedings, provides:

"The judge may, at any stage of a proceeding under this chapter, refer the proceeding to a referee in bankruptcy to hear and determine any and all matters not reserved to the judge by the provisions of this chapter, or to a referee as special master, to hear and report generally or upon specified matters. Only under special circumstances shall references be made to a special master who is not a referee."

Pursuant to the provisions of Section 117 this Court did, and for special circumstances enumerated in the original order of reference to Julius I. Friedman as Special Master, confer the power upon

the Special Master to act with the same power and with the same duties and the same responsibilities as if this proceeding had been referred to the Referee or to the Referee as Special Master. With full knowledge of the contents and the effect of the order of reference to Julius I. Friedman, the parties litigant appeared before the Special Master without any objection as to his qualifications or his question of interest. The Special Master devoted a great deal of time and energy in conducting the various hearings and making the detailed and specific findings of fact, his conclusions of law and his report on decisions which supported his recommendations.

It is not necessary for the Court to decide whether the findings of fact are entitled to the same weight as if there was a verdict by a jury. Since the Federal Rules of Civil Procedure are applicable to bankruptcy matters where not otherwise augmented or changed, the findings of fact of the Special Master are entitled to great weight and consideration and should not and will not be disregarded if there is substantial substantive evidence to support his findings and recommendations. The Special Master's report and his definite findings of fact are amply supported by the record, and this Court concurs in the findings of fact as contained in the two reports, and those findings of fact as made by the Master are concurred in and adopted as the findings of fact by this Court, and the Master's reports in that respect be and the same are hereby confirmed (South Falls Corporation v. Rochelle, U.S.C.A. 5, 329 F.2d 611).

CONCLUSIONS OF LAW:

This Court finds and so holds that while the Master's recommendation as to law or the ultimate conclusions which are to be reached from the factual matters are not entitled to the same weight as the Master's findings of fact, yet they are persuasive and will not be set aside by the Court without good rea-son. Extensive briefs were filed by counsel for the respective parties before the Master. Copies of those briefs have been submitted to this Court, as well as additional memoranda. The decision by the United States Court of Appeals for the Fifth Circuit in the case of Maule Industries, Inc. v. Gerstel, Trustee, 232 F.2d 294 is a clear enunciation of the principles of law applicable in the Fifth Circuit and is binding upon this Court with respect to disregarding the corporate entity. It is pointed out on page 11 that the United States Court of Appeals, Fifth Circuit, has followed the doctrine established in the Maule case, supra, in many later opinions.

While no additional authorities seem to be necessary, the Court mentions the decision of the Supreme Court of Florida in State ex rel. Continental Distilling Sales Co. v. Vocelle, 158 Fla. 100, 27 So.2d 728, which case was pointed out to this Court in the main brief filed by the trustees and in which the Supreme Court of Florida enunciated the following rule:

"Corporations are legal entities by fiction of law, and their purpose is generally to limit liability and serve a business convenience, and courts are reluctant to pierce the corporate veil, and only in exceptional cases will they do so, as in the case of fraud where creditors are misled or where corporation is created for illegal purpose or to commit an illegal act."

Section 2 of the general Bankruptcy Act provides for the jurisdiction of the Bankruptcy Court, to require accountings and to take into the possession of the trustee assets which belong to the debtor estate, and to do it even by summary proceedings or proceedings within the Bankruptcy Court, exclusive of the other remedy of ancillary proceedings. Section 102, affecting Chapter X proceedings, specifically provides that Section 2 shall, insofar as it is not inconsistent or in conflict, apply in Chapter X proceedings. Section 2, paragraph (21), specifically

authorizes the Bankruptcy Court to exercise jurisdiction over assignees and other parties holding title and possession to property belonging to the bankrupt's estate (see Beneficial Finance Co. of New Jersey v. Ray, as Trustee, U.S.C.A. 5, 328 F.2d 55). In addition, Sections 196 and 197 of the Bankruptcy Act, applicable to Chapter X proceedings, confer definite authority and jurisdiction to require proof of claims of all creditors and to give notice to and bring into the Court the holders of secured claims. Such a proceeding was followed in this case for proceedings instituted under Sections 196 and 197, and the secured creditors did file in this Court, and in particular Meadow Brook National Bank, their respective proofs of claim with this Court without reservation, exception or objection.

■ Without going into a detailed analysis of all of the decisions relied upon by respective counsel or the many authorities relied upon by the Special Master, the authorities weightedly support the position of the trustees in their objections to the claim of Meadow Brook and the conclusions of the Master as to the law applicable (see Collier on Bankruptcy, 14th Ed., Vol. 4, p. 356), where there is a complete analysis of the purpose of the Congress of the United States in adopting portions of the Uniform Fraudulent Conveyance Act as a part of Section 67(d)).

From the factual matters as found by the Master and which have been confirmed by this Court, this case falls squarely under the provisions of Section 67(d), which provides:

"Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent."

There are other provisions as pointed out by the authors of Collier on Bankruptcy, as above mentioned, in other parts of Section 67(d) which would be applicable even in cases where the facts are not as strong as they have been determined in this case.

A recent decision by the District Court of Appeal of Florida, Third District, in the case of Alberts et al. v. Schneiderman, 182 So.2d 50, sustains the position taken by the trustees and the Special Master that the Florida Statute, Section 608.55, F.S.A., voiding certain assignments, is applicable to the issue here involved.

The recent decision of the Supreme Court of the United States in Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391, is also specifically applicable in strengthening the jurisdiction of this Court in this proceeding to order the restitution of the sums paid by Dynamic Enterprises, Inc. to Meadow Brook National Bank after the assignments were made in the latter part of 1962. The amount found in the report of the Special Master of $34,000.00 principal, plus $9,-355.65 interest, or a total of $43,355.65, should be returned to the trustees herein as trustees for Dynamic Enterprises, Inc.

## FINAL JUDGMENT AND DECREE

It is, therefore, ordered, adjudged and decreed, that the Special Master's reports, original and supplemental, and his findings of fact, conclusions of law and his recommendations insofar as they apply to Meadow Brook National Bank, be and the same are hereby confirmed, and that the objections of the trustees to the claim of Meadow Brook National Bank, both as a secured and an unsecured creditor, be and the same are hereby sustained, but without prejudice to the allowance of the unsecured claim of Meadow Brook National Bank, as evidenced by the promissory note in question, against Realsite, Inc., for the principal due on said note up to July 5, 1963, to-

gether with interest up to that date, but not thereafter. Since the foregoing position with reference to allowance of the unsecured claim of Meadow Brook National Bank against Realsite, Inc. was conceded by the trustees in their first objections to the claim against Dynamic Enterprises, Inc. and there has been no contest on that issue, the said Meadow Brook National Bank is not entitled to any cost allowance on the theory of a controversial issue on that point.

The Meadow Brook National Bank is hereby ordered to forthwith reassign and transfer to the trustees for Dynamic Enterprises, Inc. any and all of the security, pledges, notes or contracts or other types of evidence of indebtedness which it had received by virtue of the original assignments on and after November 2, 1962.

The Special Master's supplemental report, on page "4" thereof, specifically shows that after the assignment from November 2, 1962 up until July 1, 1963, Meadow Brook National Bank derived from collections from the assigned accounts the sum of $34,000.00, plus interest which was paid up to July 1, 1963 in the amount of $9,355.65, making a total of the amount recoverable from Meadow Brock National Bank in the sum of $43,355.65.

This Court is guided by equitable principles and since it appears from the Master's reports and from the admitted testimony in the case that after July 1, 1963 the trustees have received payments from the various accounts and contracts assigned, interest accruing since July 1, 1963 to the date of this order is not to be charged to the Meadow Brook National Bank. The amount set forth herein as a combination of principal and interest as of July 1, 1963 is the total sum which Meadow Brook National Bank is hereby ordered and directed to pay to the trustees under and by virtue of this judgment, together with interest on said amount at the rate of 6% per annum from the date hereof.

The Court reserves jurisdiction, upon proper written application being made and notice given, to determine what amount, if any, shall be assessed against Meadow Brook National Bank as its proportionate share of the cost of taking testimony and the Master's fee and expenses.