**In re TOTAL ACQUISITION CORP., Debtor.**

**SOL-TABB, INC., Plaintiff,**

**v.**

**TOTAL ACQUISITION CORP., Defendant.**

**Raymond A. McGEE, Plaintiff,**

**v.**

**TOTAL ACQUISITION CORP., Debtor/Debtor in Possession, Defendant.**

**Bankruptcy No. 82–02196–BKC–SMW. Adv. Nos. 82–0071–BKC–SMW–A, 82–1109–BKC–SMW–A.**

United States Bankruptcy Court, S.D. Florida.

April 8, 1983.

Scott L. Baena, Stroock & Stroock & Lavan, Miami, Fla., for plaintiff Sol-Tabb.

Paul G. Hyman, Jr., Miami, Fla., for defendant.

John Genovese, Holland & Knight, Miami, Fla., for plaintiff McGee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ADVERSARY COMPLAINTS

SIDNEY M. WEAVER, District Judge.

THIS MATTER came on to be heard by the Court on two complaints filed against

this Debtor by Sol-Tabb, Inc. ("ST") and Raymond A. McGee ("McGEE"), respectively. Each of these adversary proceedings was tried before the Court separately however, as will be discussed further hereinbelow, both adversary proceedings concerned the same subject matter and, essentially, sought the same relief. Indeed, by stipulation of the parties, all of the record in the McGEE proceeding was adopted as part of the record in the ST proceeding. Accordingly, notions of judicial economy dictate that the Court consolidate its findings and conclusions in respect of both adversary proceedings in this single opinion. The Court heard the testimony and examined the evidence presented, observed the candor and demeanor of the witnesses, considered the arguments and memoranda of counsel, in each of the adversary proceedings, and makes the following findings of fact and conclusions of law.

This Court has subject matter jurisdiction of these contested matters pursuant to 28 U.S.C. § 1471 and § (d) of the Emergency Rule adopted by the Order of the United States District Court for the Southern District of Florida dated December 22, 1982.

The center of the controversy is an agreement between ST (which is also a debtor in Chapter 11 proceedings pending before this Court) and the Debtor herein, Total Acquisition Corp. ("TOTAL"), dated September 29, 1982 (the "agreement"). Briefly, that agreement provided for the sale of all assets of ST to TOTAL in consideration for, inter alia, TOTAL's assumption of ST's liabilities (with recourse), infusion of working capital by TOTAL, the purchase of equipment by TOTAL to be used in its forthgoing operations and a deferred payment pursuant to a promissory note payable to ST for the principal amount of $750,000.

Prior to the date of the agreement, ST was engaged in the operation of mechanical and electronic pin and video games. TOTAL, on the other hand, had no operations prior to the date of the agreement and, indeed, was formed for the sole purpose of effectuating the transfer contemplated by the agreement.

Due to a variety of circumstances, ST was experiencing a severe business downturn during 1982. The economic effect was that ST was unable to pay its debts as they came due and, further, it was unable to purchase equipment which would keep it competitive in its industry. The economic situation of ST became intolerable in mid-1982 and it sought a purchaser. Sometime in April, 1982, discussions occurred between ST and Mr. Lester Steiner, a prospective purchaser. Those discussions culminated in the agreement referred to above. During the course of the discussions ST made it clear to Mr. Steiner that it had two absolute and immutable requirements: First, Mr. Steiner had to demonstrate his commitment to the success of the operation by obtaining sufficient funds for its working capital. Second, ST's creditors were to be brought current and, over time, be paid in full. By that time, ST had indebtedness of some $4.5 million.

That ST was adamant in respect of its requirement that Mr. Steiner, who had by then organized TOTAL, have funds available for purposes of working capital is evidenced by, firstly, the agreement itself and, secondly, occurrences at the time of closing.

More specifically, Section 8(d) of the agreement provided:

(d) *Line of Credit.* That by the Closing Date, Buyer or TOTAL shall have established a [sic] irrevocable line of credit for $500,000 with a financial institution or other acceptable source to Seller to be used for working capital for Buyer and for no other purpose, for use immediately at closing.

Then, at the closing, Sol Tabb, chief executive officer of ST, insisted upon verification of the existence of the aforementioned line of credit. Thereupon, Mr. Steiner initiated two phone calls to what were purported to be financial institutions at which such lines of credit were available. A Closing Memorandum, also in evidence, was thereafter prepared to memorialize these conversations and the fact that Mr. Steiner and his two associates, Victor Sayyah and Sorkin Webbe, had lines of credit made

available, each in excess of $500,000 at both Florida National Bank of Miami and American National Trust of Chicago.

The Court doubts the credibility of TOTAL's version of the foregoing telephone conversations. This is especially so in light of the testimony of Francis Guiffrida, Vice President of Florida National Bank of Miami, since he testified that no line of credit existed with that bank as was represented in the Closing Memorandum. Even more troublesome is the testimony of John Lubera, Executive Vice President of Florida National Bank of Miami, that that institution had never received a request for a line of that size from Messrs. Steiner, Sayyah or Webbe, nor ever heard of, Messrs. Sayyah and Webbe. Mr. Lubera did indicate that the bank previously had a loan relationship with Mr. Steiner, but that loan was for an insubstantial amount and had been repaid.

As far as American National Trust of Chicago, no evidence of the existence of a line was presented by TOTAL; however, the Court allowed TOTAL leave to produce evidence of such line after the close of the case. Several days beyond the time allowed by the Court for the submission of this evidence, TOTAL filed a motion to reopen the proceedings for the purpose of admitting a series of documents annexed to the motion. The documents so annexed were admitted in evidence subject to McGEE's and ST's right of requesting an evidentiary hearing with respect thereto. The documents, Exhibit F in the McGee proceeding, include a letter from Kurt Liljedahl, Commercial Bank Officer of American National Bank and Trust Company of Chicago, presumably the same entity referred to in the Closing Memorandum.

The Court finds that the documents have no probative value. More particularly, the documents relate to a line of credit extended by that institution to Victor Sayyah on September 16, 1982. It was, as stated above and as clearly provided for in the purchase agreement, expressly required by the parties that either TOTAL, or its parent company, Total Investment Company, shall have established a line of credit to be used for working capital in the continuing operations of TOTAL and for no other purpose.

Mr. Sayyah has been characterized as a rather substantial individual and successful businessman. It is not unusual to expect, therefore, that such a person would have financial capabilities with lending institutions. There is no proof that that line was in existence or that these was any loan availability under the line at the date of the closing. And, more importantly, there is no proof that the line was established for TOTAL's working capital purposes solely. Nothing contained in the Closing Memorandum closes that gap in the evidence, nor does it seem appropriate to make such an inference of such a critical fact.

Throughout his testimony, Mr. Steiner attempted to persuade this Court that he and his associates, Sayyah and Webbe, were of substantial wealth and resources so that the availability of credit was never a problem. The Court is not persuaded by this argument since there was an absolute requirement that a line of credit be established by the time of closing. Mr. Steiner's credibility was undermined by his testimony in respect of his own wealth. Much of the wealth he acclaimed was not even reflected on his own financial statement which is in evidence.

Events occurring subsequent to the closing upon the agreement also call into question the conduct of Mr. Steiner and TOTAL and, in certain instances, exhibit a course of conduct which characterized their business dealings with ST. At the closing a check was tendered by TOTAL to counsel for ST for attorneys' fees incurred in connection with the transaction. TOTAL was obligated for such expenses by virtue of the terms of the agreement as well as a closing memorandum dated October 1, 1982, also in evidence. That check was returned for insufficient funds.

More importantly, no payments whatsoever were made by TOTAL to any creditors of ST in derrogation of the second absolute and immutable requirement imposed by ST as aforesaid. By way of explanation, TO-

TAL argued that it did not make any payments to creditors because it disputed certain of the alleged debts. Even if true, this would not excuse TOTAL's refusal to pay every debt especially when it was aware of threatened litigation by some creditors who were still looking to ST for payment.

TOTAL attempted to justify its conduct on the basis that once it assumed managerial control over the operations of what was once ST, it became necessary to institute new management policies and controls which included a freeze on the purchase of equipment and the payment of creditors, the termination of certain of ST's employees, and reconsideration of payments theretofore made. Such an explanation might otherwise be palatable, but not here. TOTAL contends that it knew nothing of the problems which beset ST since it had not taken the opportunity to examine any of ST's books and records prior to the purchase agreement. It is incomprehensible that TOTAL failed to take such a small precaution which must be viewed as customary in a transaction of this nature. Indeed, such failure, when viewed in light of all of the circumstances attending this transaction, is but another indicia of the actual intent of TOTAL. That is, upon all the evidence, it appears that TOTAL sought to obtain all the advantages of a business which dealt in cash without intending to ever fulfill the few but nonetheless important obligations imposed upon it under the purchase agreement.

It was established by ST that at the date of the agreement, September 29, 1982, ST was insolvent. ST's accountant testified that as of August 31, 1982, ST had a net worth of zero without giving effect to any adjustments at fiscal year-end. He further testified that if such adjustments had been made the effect would be to impair capital of ST such that its net worth would be negative. Mr. Tabb's testimony indicated the deteriorating financial condition of ST to the date of the closing with TOTAL. Thus, it does not appear that there were any occurrences between August 31, 1982 and September 29, 1982, which would have had a positive effect upon the net worth of ST. Further, Mr. Tabb testified that ST was generally unable to pay its debts as they came due which was a motivation for the transaction with TOTAL. TOTAL failed to produce any evidence or offer any testimony contrary to the foregoing.

On the foregoing facts, ST contends that the transfer to TOTAL should be avoided as a fraudulent conveyance pursuant to 11 U.S.C. § 548 or, alternatively, that the transfer be rescinded due to either TOTAL's breach of contract or fraudulent misrepresentations. McGEE, a creditor of ST, seeks relief under Fla.Stat. § 726.01 which proscribes fraudulent conveyances or, alternatively, Fla.Stat. Ch. 676 concerning bulk transfers.

The Court concludes that ST has carried its burden of proving that the transfer to TOTAL by ST was in contravention of 11 U.S.C. § 548 and should, therefore, be declared void. Similarly, the Court concludes that McGEE has carried his burden of proving that the transfer was a fraudulent conveyance which is proscribed by Fla.Stat. § 726.01 and should, therefore, be set aside. Having so concluded, the Court does not deem it necessary to determine whether ST or McGEE should be entitled to relief under their alternative theories as referred to above.

### FRAUDULENT CONVEYANCE—11 U.S.C. § 548

ST relies upon 11 U.S.C. § 548(a)(2), which provides, in pertinent part, that the trustee (or the debtor-in-possession in a case under Chapter 11) may:

(a) ... avoid any transfer of an interest of the debtor in property, ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made ... or became

insolvent as a result of such transfer
. . . .

The disputed transaction took place within the requisite period of one year prior to the date of ST's own petition in bankruptcy (i.e., December 8, 1982). It was established that ST was insolvent at the time of the transfer. Thus, the only question remaining is whether ST received less than a reasonably equivalent value in exchange for the transfer·of all of its assets to TOTAL. The Court concludes that it did.

Although Mr. Tabb testified that had TOTAL fulfilled its obligations under the purchase agreement and related promissory note, such consideration would have been a reasonably equivalent value in exchange for ST's assets, the test prescribed by § 548(a)(2) is whether what was *received* had such value. In the case *sub judice,* ST hardly received anything at all. Indeed, the Court is of the opinion that TOTAL had no intention of fulfilling any of the more significant obligations for which it was bound to ST under the purchase agreement. In so concluding, the Court considered the following:

- TOTAL's failure to examine the books and records of ST or inspect its physical assets to ascertain the true nature and extent of the liabilities it was assuming and the value of such assets;
- The failure of either TOTAL or its parent to establish the essential line of credit (and TOTAL's equivocal defense of this point);
- TOTAL's immediate defalcation on payment tendered at the closing;
- TOTAL's failure to make any payments whatsoever to ST's creditors in accordance with its assumption of those debts;
- TOTAL's quick termination of certain of ST's key employees;
- TOTAL's failure to make any meaningful investment in its acquisition; and
- Mr. Steiner's personal withdrawal of monies from the company (some of which have now been restored).

When, as in this case, there has been a showing that a transfer was for less than a reasonably equivalent value and made at a time when the debtor is insolvent, there is a conclusive presumption of fraud. *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980), *In re Hester,* 14 B.R. 647 (Bkrtcy.D.Tenn.1981), *In re Realsite, Inc.,* 256 F.Supp. 322 (S.D.Fla.1966).

### FRAUDULENT CONVEYANCE—FLA. STAT. § 726.01

McGEE relies upon Fla.Stat. § 726.01 which prohibits transfers where the intent, as evidenced by the transaction or the effect of the transaction, is to hinder, delay or defraud creditors of the transferor. *Stelle v. Dennis,* 104 Fla. 384, 140 So. 194 (Fla.1932); *Livesay Industries, Inc. v. Livesay Window Co.,* 305 F.2d 934 (5th Cir.1962).

The vantage from which the subject transfer must be perceived is somewhat different under McGEE's theory of this case since the proper perspective is that of creditors of the transferor.

Over time, there has evolved a veritable laundry list of facts which, upon their occurrence, are presumptive evidence of a fraudulent conveyance: the so-called "badges of fraud." *Cleveland Trust Co. v. Foster,* 93 So.2d 112, 114 (Fla.1957). In the instant case, McGEE has proved at least four of the eight recognized "badges of fraud" in respect of the contested transaction; to-wit:

- insolvency of the transferor;
- lack of consideration for the conveyance;
- the pendency or threat of litigation; and
- the transfer of the debtor's entire estate.

In this regard it is significant that TOTAL was undercapitalized and, indeed, itself insolvent. This poor financial situation was exacerbated by its new undertaking to pay ST $750,000 pursuant to the promissory note. Paradoxically, TOTAL—without any further capital infusions—was in worse financial condition than ST. Thus, in this respect as well, the transaction had the

effect of hindering, delaying and defrauding ST's creditors.

■ At the close of McGEE's case in chief, the Court concluded that McGEE had made a prima facie showing of a fraudulent conveyance under Fla.Stat. § 726.01. *Bayview Estates Corp. v. Southerland,* 114 Fla. 635, 154 So. 894 (1934). At that juncture, the burden of going forward shifted to TOTAL which it simply failed to carry by offering competent evidence in rebuttal.

■ This conclusion is not inconsistent with the Court's conclusions under 11 U.S.C. § 548. It is not necessary to demonstrate the actual intent of the transferor to defraud its creditors to prove the existence of a fraudulent conveyance. Evidence of an act or series of acts with the effect of defrauding creditors of the transferor is sufficient. "When the legal effect of a conveyance is to defraud creditors, no matter what the actual intention may have been, it is fraud in law." *Stelle v. Dennis,* supra 140 So. at 195; also see: *In re Flanzbaum,* 10 B.R. 420 (Bkrtcy.S.D.Fla. 1981).

Upon the foregoing, the Court finds and concludes that the assets of Total Acquisition Corp. should be deemed assets of Sol-Tabb, Inc. and that the transfer of such assets by the Agreement for Purchase and Sale of Assets of September 29, 1982 should be cancelled and set aside. The plaintiff, Sol-Tabb, Inc., shall be entitled to an accounting of its property and the proceeds of its property. Neither Sol-Tabb, Inc. nor Raymond A. McGee is entitled to a money judgment against said Total Acquisition Corp. As is required by B.R. 921(a), separate final judgment will be entered in accordance with these findings and conclusions. Costs will be taxed on motion.